**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X Case No.: 25-cv-08553
SHU XU,

                                       Plaintiff,

                                                   **COMPLAINT**

            -against-

ALLY FINANCIAL INC. and DARCARS OF
RAILROAD AVENUE, INC. d/b/a Lexus of Mount Kisco,

                                  Defendants.
-------------------------------------------------------------------------X

        Plaintiff, by and through his attorneys, KIDD LAW GROUP PLLC, upon knowledge as to himself and his own acts, and as to all other matters upon information and belief, brings this complaint against above-named defendants and in support thereof alleges the following:

<u>INTRODUCTION</u>

        1.    This action centers around the unlawful conduct of defendant auto dealership Darcars of Railroad Avenue, Inc. d/b/a Lexus of Mount Kisco, in selling a vehicle to plaintiff, Shu Xu, even though Lexus of Mount Kisco did not own the vehicle on the date of sale and there was a pre-existing lien on the title to the vehicle which had not been cleared.

2.      Lexus of Mount Kisco kept plaintiff in the dark regarding these fatal deficiencies in the sale transaction, obliging plaintiff to wait hopelessly for several weeks to receive delivery of the vehicle he had bought. During these weeks of waiting, plaintiff was unable to work and therefore earned no income.

3.      Plaintiff is not alone; Lexus of Mount Kisco has sold to other consumers cars which it did not own at the date of sale. Lexus of Mount Kisco violated the law in other respects towards plaintiff.

4.      Plaintiff brings this action against Lexus of Mount Kisco for damages pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., New York Uniform Commercial Code ("NYUCC") §§ 2-312 and 2-314, and for common-law fraud.

<u>JURISDICTION AND VENUE</u>

5.      Plaintiff re-alleges paragraphs 1-4 as if fully re-stated herein.

6.      This Court has federal question jurisdiction pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

7.      With regard to 15 U.S.C. § 2310(d), as set forth below, the amount in controversy concerning all claims to be determined in the suit is over $50,000.

8.      This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

PARTIES

9.      Plaintiff re-alleges paragraphs 1-8 as if fully re-stated herein.

10.     Plaintiff is a natural person who at all relevant times resided in Queens County, State of New York.

11.     Upon information and belief, defendant Ally Financial Inc. ("Ally") is and was at all material times a foreign business corporation incorporated in the State of Delaware.

12.     Upon information and belief, Ally was at all material times and is authorized to do business and doing business in the State of New York.

13.     The net worth of Ally is greater than One Billion Dollars.

14.     Defendant Darcars of Railroad Avenue, Inc. is and was at all material times a foreign business corporation incorporated in the State of Connecticut.

15.     At all material times and as of the date of the filing of this action, Darcars of Railroad Avenue, Inc. did and does business as "Lexus of Mount Kisco".

16.     At all material times and as of the date of the filing of this action, Darcars of Railroad Avenue, Inc. did and does business in names other than "Lexus of Mount Kisco".

17.     At all material times and as of the date of the filing of this action, Lexus of Mount Kisco dealt and deals in the retail buying and selling of new and used automobiles.

18.    At all material times and as of the date of the filing of this action, Lexus of Mount Kisco was and is authorized by the manufacturer of Lexus automobiles to deal in new Lexus automobiles.

19.    At all material times and as of the date of the filing of this action, Lexus of Mount Kisco was and is located in Mount Kisco, Westchester County, State of New York.

20.    At all material times and as of the date of the filing of this action, Lexus of Mount Kisco was and is located at 275 Kisco Avenue, Mount Kisco, New York 10549.

21.    The net worth of Lexus of Mount Kisco was and is greater than Five Million Dollars.

22.    Plaintiff entered into a consumer credit transaction with Lexus of Mount Kisco as contemplated by 15 U.S.C. § 1602(i).

23.    Lexus of Mount Kisco is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17), in that at all relevant times Lexus of Mount Kisco, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and Lexus of Mount Kisco is the person to whom the debt arising from the consumer credit transaction was initially payable.

24.    The transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

25.    Lexus of Mount Kisco assigned plaintiff's loan to Ally.

26.    By virtue of the Holder Rules, Ally is jointly and severally liable with Lexus of Mount Kisco to plaintiff for the misconduct of Lexus of Mount Kisco alleged herein.

27.    Lexus of Mount Kisco shall hereinafter be referred to as the "Dealership".

## FACTUAL ALLEGATIONS

28.    Plaintiff re-alleges paragraphs 1-27 as if fully re-stated herein.

29.    On or about December 2024, plaintiff saw advertised on the Dealership's website a used 2022 Lexus ES 300H automobile (the "Vehicle").

30.    In December 2024, the Dealership advertised the Vehicle for sale online.

31.    In the advertisement, the Dealership advertised the mileage of the Vehicle as 59,335 miles.

32.    In the advertisement, plaintiff noticed that the Dealership advertised the mileage of the Vehicle as 59,335 miles.

33.    Plaintiff, an Uber and Lyft taxi driver by occupation, was interested in buying the Vehicle for work.

34.    In December 2024, plaintiff was the father of a 9-year-old son, who resided with his mother in Upstate New York.

35.    Plaintiff also intended to use the Vehicle for household, personal and family purposes.

36.     In December 2024, plaintiff visited the Dealership on more than one occasion.

37.     On the first occasion of his visit, on or about December 19, 2024, plaintiff met Victor Cunha ("Victor"), a salesman at the Dealership.

38.     In December 2024, Victor was a salesman at the Dealership.

39.     In December 2024, Victor was an employee at the Dealership.

40.     On the date of the filing of this action, Victor is an employee at the Dealership.

41.     On his first visit, plaintiff viewed the Vehicle.

42.     On his first visit, plaintiff informed the Dealership that he was a taxi driver by occupation, driving for Uber and Lyft.

43.     On his first visit, plaintiff informed the Dealership that he would like to purchase the Vehicle and that he would use it as a taxi.

44.     On or about December 23, 2024, plaintiff again visited the Dealership and agreed with the Dealership on the sale price for the Vehicle.

45.     On December 24, 2024, plaintiff visited the Dealership a third time.

46.     On December 24, 2024 when plaintiff visited the Dealership, plaintiff was accompanied by a friend.

47.     In addition to Victor, over the course of his visits to the Dealership, plaintiff also dealt with Bruno and Stanley.

48.     In December 2024, Bruno was a salesman at the Dealership.

49.     In December 2024, Bruno was an employee at the Dealership.

50.     On the date of the filing of this action, Bruno is an employee at the Dealership.

51.     In December 2024, Stanley was a finance manager at the Dealership.

52.     In December 2024, Stanley was an employee at the Dealership.

53.     On the date of the filing of this action, Stanley is an employee at the Dealership.

54.     Plaintiff bought the Vehicle from the Dealership on December 24, 2024.

55.     The Dealership sold the Vehicle to plaintiff on December 24, 2024.

56.     The Dealership sold the Vehicle to plaintiff for $33,750, inclusive of sales tax, customary and usual Department of Motor Vehicles ("DMV") fees, and dealer documentation fee.

57.     The total sale price of the Vehicle including loan interest was $48,584.

58.     The Dealership collected from plaintiff a down payment of $2,500 towards the sale price of the Vehicle.

59.     Plaintiff was in the process of selling his old car in order to obtain the $2,500 down payment for the Vehicle.

60.     Before plaintiff bought the Vehicle on December 24, 2024, plaintiff informed Bruno and Stanley that he was selling his old car in light of the fact that he was acquiring the Vehicle.

61.     Before plaintiff bought the Vehicle on December 24, 2024, plaintiff informed Bruno and Stanley that he was acquiring the Vehicle in order to operate it as a taxicab or for hire vehicle after the necessary legal adjustments were made.

62.     Bruno and Stanley agreed and encouraged plaintiff to proceed with the sale of his old car.

63.     Plaintiff sold his old car in reliance on the Dealership delivering to him the Vehicle once he bought it.

64.     At no time before he bought the Vehicle did the Dealership inform plaintiff that it would not be able to deliver the Vehicle to him.

65.     Before plaintiff bought the Vehicle on December 24, 2024, the Dealership knew that plaintiff's occupation was a taxi driver.

66.     Before plaintiff bought the Vehicle on December 24, 2024, the Dealership knew that plaintiff intended to use the Vehicle as a taxicab or for hire vehicle.

67.     On December 24, 2024, the Dealership did not provide plaintiff or his friend with the sale documents required by law.

68.     The Dealership provided plaintiff with an information contact leaflet which indicated that the Dealership had located Ally to provide the loan for plaintiff's purchase.

69.     On December 24, 2024, plaintiff agreed with the Dealership to return to the Dealership on December 27, 2024 to pick up the Vehicle.

70.     The Dealership agreed with plaintiff to deliver the Vehicle to him on December 27, 2024.

71.     Plaintiff returned to the Dealership on December 27, 2024 to pick up the Vehicle.

72.     When plaintiff arrived at the Dealership on December 27, 2024, Bruno and Stanley told plaintiff that the Dealership's "DMV system was down" and that the Dealership could therefore not complete the paperwork, which meant that the Dealership could not deliver the Vehicle to plaintiff on that day.

73.     Bruno and Stanley told plaintiff to go home and wait for the Dealership to fix the system before returning.

74.     Bruno and Stanley told plaintiff that the Dealership would contact him and let him know when to return to the Dealership to pick up the Vehicle.

75.     The Dealership provided a loaner car to plaintiff on December 27, 2024.

76.     The loaner car was not registered to plaintiff; the Dealership knew the loaner car was not registered to plaintiff.

77.     The loaner car did not have taxicab license plates; plaintiff was incapable of obtaining taxicab license plates for the loaner car.

78.     The Dealership knew that the loaner car did not have taxicab license plates and that plaintiff was incapable of obtaining taxicab license plates for the loaner car.

79.     Therefore, plaintiff could not use the loaner car as a taxicab or for hire vehicle.

80.     On December 27, 2024 when the Dealership provided the loaner car to plaintiff, plaintiff never intended to use the loaner car as a taxicab or for hire vehicle.

81.     The Dealership knew that plaintiff could not lawfully use the loaner car as a taxicab or for hire vehicle.

82.     The Dealership knew that plaintiff did not intend to use the loaner car as a taxicab or for hire vehicle because plaintiff so informed the Dealership on December 27, 2024.

83.     During the time the loaner car was in his possession, plaintiff did not use it as a taxicab or for hire vehicle; plaintiff used the loaner car solely for personal, household and family purposes.

84.     In the days following December 27, 2024, plaintiff went online to Ally's website and viewed his account information.

85.     In said information, Ally stated that the purchase "Contract Date" was December 24, 2024.

86.     Ally also informed plaintiff that his monthly loan payment amount is $768.07 for 60 months, and that the first loan payment was due on February 8, 2025.

87.     In the days following December 27, 2024, the Dealership did not contact plaintiff; it was left for plaintiff to contact the Dealership repeatedly to inquire as to when the Dealership would make the Vehicle available for him to pick up.

88.     Often, no-one at the Dealership answered plaintiff's calls; when someone did answer, the Dealership told plaintiff that the "DMV" problem was still ongoing and that he had to continue to wait to pick up the Vehicle.

89.     The Dealership had placed plaintiff–who had a 9-year-old son who relied on him for support–in the position where he had no income because he had no taxicab to drive, the first loan payment of $768.07 was rapidly coming due, he had paid insurance for the Vehicle of $1,801, and he had to pay all his usual living and other expenses such as rent.

90.     The situation had begun to take on a nightmarish quality for plaintiff, with plaintiff being unable properly to sleep, eat or perform usual daily functions due to his debilitating worry and distress at having no income.

91.     Plaintiff repeatedly informed the Dealership that he had no income while he was waiting for the Dealership to deliver the Vehicle to him.

92.     While he was waiting for the Dealership to deliver the Vehicle to him, plaintiff repeated to the Dealership that he could not operate the loaner car as a taxicab or for hire vehicle.

93.     The Dealership knew that plaintiff had no income while he was waiting for the Dealership to deliver the Vehicle to him, as he so informed Bruno, at a minimum.

94.     On January 14, 2025, desperate and seeing no way out, plaintiff contacted Toyota Motor North America, Inc.'s ("TMNA") customer relations department responsible for Lexus, to complain that the Dealership had yet to deliver the Vehicle to him although he had bought it on December 24, 2024.

95.     In all, plaintiff contacted TMNA on three separate occasions in January 2025.

96.    TMNA never reached out to plaintiff to follow up with any news of progress on his complaints; it was always left to plaintiff to initiate contact with TMNA.

97.    It was by virtue of plaintiff so communicating with TMNA that plaintiff learned the real reason the Dealership had been unable to deliver the Vehicle to him since the promised date of December 27, 2024: the Dealership did not possess the certificate of title to the Vehicle when the Dealership sold the Vehicle to him on December 24, 2024.

98.    The Dealership informed TMNA and plaintiff that there was a lien on the Vehicle's title and that the lien had still not been cleared as of January 22, 2025, so the Dealership was unable to deliver the Vehicle to plaintiff until the lien cleared, that is, until the title was free of the lien and the Dealership was thereby able to obtain the certificate of title, which it still did not have.

99.    On December 24, 2024, the Dealership did not have title to the Vehicle.

100.    On December 24, 2024, the Dealership did not have the title to the Vehicle.

101.    On December 24, 2024, the Dealership did not have in its physical possession the certificate of title to the Vehicle.

102.    The Dealership did not have title to the Vehicle when it sold the Vehicle to plaintiff on December 24, 2024.

103.    The Dealership did not have the title to the Vehicle when it sold the Vehicle to plaintiff on December 24, 2024.

104.    The Dealership did not have the certificate of title to the Vehicle when it sold the Vehicle to plaintiff on December 24, 2024.

105.    On December 24, 2024, the Dealership was not the owner of the Vehicle.

106.    On December 24, 2024, the Dealership knew it did not have title to the Vehicle or the certificate of title to the Vehicle and knew it was not the title owner of the Vehicle.

107.    On December 24, 2024, there was a pre-existing lien on the title to the Vehicle which had not been cleared.

108.    On December 24, 2024, there was a pre-existing lien on the title to the Vehicle which had not been cleared when the Dealership sold the Vehicle to plaintiff.

109.    On December 24, 2024, the Dealership knew there was a pre-existing lien on the title to the Vehicle which had not been cleared.

110.    On December 24, 2024, the Dealership did not disclose to plaintiff that it did not have title to the Vehicle or the certificate of title to the Vehicle or that it was not the title owner of the Vehicle.

111.    On December 24, 2024, the Dealership did not disclose to plaintiff that there was a pre-existing lien on the title to the Vehicle which had not been cleared.

112.    This news came as a shock and dismay to plaintiff, as the Dealership had never before that informed him of any issues with the title to the Vehicle.

113.    Plaintiff realized then that the Dealership had been lying to him the whole time, in telling him that its "DMV system was down".

114.    Plaintiff would not have bought the Vehicle if he had known that there was a lien on the Vehicle's title and that the Dealership did not have clear title to the Vehicle.

115.    Plaintiff would not have bought the Vehicle if he had known that the Dealership did not have the certificate of title to the Vehicle.

116.    Plaintiff would not have bought the Vehicle if he had known that there was a pre-existing lien on the title to the Vehicle which had not been cleared.

117.    Plaintiff asked Bruno to unwind the sale and return to him his down payment of $2,500 so he could go elsewhere to purchase a different car.

118.    However, Bruno told plaintiff no, that the Dealership would not unwind the sale and give him back his down payment, but that plaintiff had a choice: either continue to wait until the Vehicle was available or purchase a more expensive car with fewer features from the Dealership in place of the Vehicle.

119.    Since plaintiff could not afford to purchase a more expensive car and told the Dealership so, the Dealership told plaintiff he should continue to wait for the Vehicle.

120.    Plaintiff continued to subsist without any income, unable to pay all his bills and living expenses and meet all his financial obligations to his young son.

121.    During one telephone call with Bruno, Bruno told plaintiff in sum or substance that, "this is nothing new; you shouldn't worry because we have two other customers whose car titles we also don't have."

122.    Far from reassuring plaintiff, this revelation caused him even greater anxiety, as plaintiff realized that his situation was not a one-off incident for the Dealership.

123.    It was not until January 30, 2025 that the Dealership informed plaintiff that the Vehicle was available for him to pick up.

124.    That same day, plaintiff went to the Dealership to pick up the Vehicle.

125.    On January 30, 2025, the Dealership instructed plaintiff to sign certain documents before it would deliver the Vehicle to him.

126.    On January 30, 2025, the Dealership instructed plaintiff to sign form MV-50: the retail certificate of sale, and form MV-82: the registration and title application.

127.    Plaintiff did not fill out or date the certificate of sale or the registration and title application.

128.    The Dealership filled out and dated the certificate of sale.

129.    Having realized by then that the Dealership had not provided him with the sale documents which it should have given to him at the sale on December 24, 2024, plaintiff asked Bruno and Stanley for all the sale documents, including the existing certificate of title for the Vehicle.

130.    Bruno and Stanley refused to provide plaintiff with the Vehicle's existing certificate of title or a copy of it for his examination.

131.    The Dealership did not provide plaintiff with the Vehicle's existing certificate of title or a copy of it for his examination on December 24, 2024, when plaintiff bought the Vehicle either.

132.    The Dealership provided plaintiff with copies of certain other documents.

133.    The Dealership provided plaintiff with the certificate of sale.

134.    The certificate of sale which the Dealership prepared and provided to the DMV was dated January 30, 2025 by the Dealership, and not the true sale date of December 24, 2024.

135.    Said certificate of sale states that the "Prior Owner" of the Vehicle is "BMW OF MT KISCO, 250 KISCO AVENUE, MT KISCO, NY 10549".

136.    "BMW OF MT KISCO" is a different auto dealership from defendant Lexus of Mount Kisco, the Dealership.

137.    Said certificate of sale states that BMW of Mt. Kisco sold the Vehicle to the Dealership on January 30, 2025.

138.    The certificate of sale states that the Dealership purchased the Vehicle from BMW of Mt. Kisco on January 30, 2025.

139.    The certificate of sale states that the Dealership sold the Vehicle to plaintiff on January 30, 2025.

140.    The certificate of sale states that plaintiff purchased the Vehicle from the Dealership on January 30, 2025.

141.   In fact, the Dealership sold the Vehicle to plaintiff on December 24, 2024, contrary to the Dealership's representation in the certificate of sale.

142.   In fact, plaintiff purchased the Vehicle from the Dealership on December 24, 2024, contrary to the Dealership's representation in the certificate of sale.

143.   The certificate of sale states that the odometer reading on the Vehicle on January 30, 2025 was 59,377 miles.

144.   The certificate of sale states that the date of the New York State inspection of the Vehicle was January 30, 2025.

145.   The certificate of sale states that the Dealership performed the said inspection for the Vehicle.

146.   The Dealership performed the New York State inspection for the Vehicle on January 30, 2025.

147.   A New York State inspection was not performed on the Vehicle within the 30-day period immediately before December 24, 2024 inclusive.

148.   The Transfer History for the Vehicle states that an entity named Step Up Mobility LLC sold the Vehicle to BMW of Mt. Kisco on November 16, 2024.

149.   The Transfer History for the Vehicle states that BMW of Mt. Kisco purchased the Vehicle from Step Up Mobility LLC on November 16, 2024.

150.   BMW of Mt. Kisco was the owner of the Vehicle from November 16, 2024 to January 30, 2025.

151.    BMW of Mt. Kisco was the owner of the Vehicle from November 16, 2024 to January 30, 2025, when the Dealership purchased the Vehicle from BMW of Mt. Kisco.

152.    The Dealership was not the owner of the Vehicle on December 24, 2024.

153.    The Dealership was not the owner of the Vehicle on December 24, 2024 when it sold the Vehicle to plaintiff.

154.    On December 24, 2024, the Dealership prepared, signed and dated the odometer disclosure statement.

155.    On December 24, 2024, the Dealership dated the odometer disclosure statement December 24, 2024.

156.    The Dealership gave plaintiff a copy of the odometer disclosure statement on January 30, 2025 after plaintiff requested all sale documents.

157.    A copy of said odometer disclosure statement which the Dealership gave to plaintiff is attached hereto as **Exhibit 1**.

158.    The odometer disclosure statement states that the mileage on the Vehicle's odometer on December 24, 2024 was 59,335 miles.

159.    On January 30, 2025, plaintiff asked the Dealership why the Vehicle's mileage as stated on the certificate of sale was 59,377, which was 42 miles more than when he bought the Vehicle on December 24, 2024 at 59,335 miles, as stated on the odometer disclosure statement.

160.    The Dealership told plaintiff the reason was that the Dealership had to drive the Vehicle elsewhere to get it inspected.

161.    In fact, as can be seen on the certificate of sale as aforementioned, the Dealership inspected the Vehicle itself.

162.    In fact, the Dealership did not drive the Vehicle elsewhere for the inspection.

163.    While plaintiff was waiting for the Dealership to deliver the Vehicle to him, the Dealership was operating the Vehicle for its own use, or had caused or allowed a third party or parties to operate the Vehicle for their own use, to the detriment of plaintiff.

164.    One of the occasions on which plaintiff informed the Dealership that he had no income while waiting for the Dealership to deliver the Vehicle to him was on or about January 17, 2025, when plaintiff so informed Bruno and showed him his wage records showing "$0.00" earnings, as can be seen from the text messages attached hereto as **Exhibit 2**.

165.    The Dealership did not submit registration and title application documents for the Vehicle to the DMV until January 30, 2025.

166.    The Dealership did not submit registration and title application documents for the Vehicle to the DMV until after January 30, 2025.

167.    In addition to the $1,801 which plaintiff had to pay for auto insurance even though the Dealership did not deliver the Vehicle to him until January 30, 2025, plaintiff also lost more than $8,000 in earnings due to the Dealership not delivering the Vehicle to him on December 27, 2024.

168.    Plaintiff also timely paid to Ally the first loan payment of $768.07 which was due on February 8, 2025.

169.    Moreover, on December 27, 2024, the Vehicle had unexpired durations for the manufacturer's hybrid warranty, drivetrain warranty, corrosion warranty, roadside warranty, safety belt and restraint warranty, amongst others.

170.    The Dealership deprived plaintiff of more than one month of the use, value and benefit of the Vehicle while covered under the manufacturer's warranties.

171.    By its aforesaid misconduct, the Dealership caused plaintiff loss of enjoyment of life, severe distress, anxiety, worry, stress, frustration, aggravation, fear, helplessness and hopelessness which have resulted in pain and suffering to plaintiff, including but not limited to: nausea, stomach upset, loss of sleep, headaches, despair, despondency, loss of financial opportunity, loss of time, loss of money and loss of the value of money.

172.    The Dealership's aforesaid misconduct resulted in severe disruption to plaintiff's occupational, personal, family and social life.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., NYUCC § 2-312

and NYUCC § 2-314

(Breach Of Warranty Of Title And Warranty Of Merchantability)

173.    Plaintiff re-alleges paragraphs 1-172 as if fully re-stated herein.

174.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*.

175.    The Dealership is a "warrantor" within the meaning of the MMWA.

176.    The Vehicle is a "consumer product" within the meaning of the MMWA.

177.    Plaintiff is a "buyer" within the meaning of New York Uniform Commercial Code ("NYUCC").

178.    The Dealership is a "seller" within the meaning of NYUCC.

179.    The Dealership is a "merchant" within the meaning of NYUCC.

180.    The Vehicle is a "good" within the meaning of NYUCC.

181.    Under NYUCC § 2-312 there arises in every contract for sale a warranty by the seller that the title conveyed to the buyer shall be good and its transfer rightful, and that the good shall be delivered free of any security interest, lien or other encumbrance of which the buyer at the time of contracting has no knowledge.

182.    Under NYUCC § 2-314, a warranty that goods shall be merchantable is implied in a contract for their sale.

183.    Under NYUCC § 2-314, among other listed conditions, goods to be merchantable must be at least such as pass without objection in the trade under the contract description and are fit for the ordinary purposes for which such goods are used.

184.    Under NYUCC § 2-312, the warranty of title arose in the Dealership's sale of the Vehicle to plaintiff.

185.    Under NYUCC § 2-314, the warranty that the Vehicle was merchantable was implied in the Dealership's sale of the Vehicle to plaintiff.

**Breach Of Warranty Of Title**

186.    The Dealership breached the warranty of title under NYUCC § 2-312 in that the Dealership did not have title to the Vehicle at the time the Dealership sold the Vehicle to plaintiff on December 24, 2024.

187.    In addition or in the alternative, the Dealership breached the warranty of title under NYUCC § 2-312 in that the Dealership did not have in its possession the certificate of title to the Vehicle at the time the Dealership sold the Vehicle to plaintiff on December 24, 2024.

188.    In addition or in the alternative, the Dealership breached the warranty of title under NYUCC § 2-312 in that the Dealership was not the title owner of the Vehicle at the time the Dealership sold the Vehicle to plaintiff on December 24, 2024.

189.    In addition or in the alternative, the Dealership breached the warranty of title under NYUCC § 2-312 in that there was a lien on the title to the Vehicle of which the Dealership knew but which the Dealership did not disclose to plaintiff at the time the Dealership sold the Vehicle to plaintiff on December 24, 2024.

190.    Due to the Dealership's breach of the warranty of title, the Dealership was unable to deliver the Vehicle to plaintiff's possession until January 30, 2025, more than a month after the Dealership sold the Vehicle to plaintiff.

191.    The Dealership's breach of the warranty of title was fraudulent in nature, egregious, in bad faith, wanton or malicious, or was reckless or grossly negligent and part of a pattern directed at the public generally and plaintiff is entitled to an award of punitive damages in addition to compensatory damages.

**Breach Of Warranty Of Merchantability**

192.    In addition, the Dealership breached the warranty of merchantability under NYUCC § 2-314 in that the Vehicle was not merchantable at the time the Dealership sold the Vehicle to plaintiff on December 24, 2024.

193.    At the time the Dealership sold the Vehicle to plaintiff, the Dealership did not have title to the Vehicle.

194.    In addition or in the alternative, the Dealership did not have in its possession the certificate of title to the Vehicle at the time the Dealership sold the Vehicle to plaintiff.

195.    A vehicle without a title would not pass without objection in the trade.

196.    On the date of sale, the Vehicle would therefore not pass without objection in the trade, in violation of the warranty of merchantability.

197.    A vehicle without a title is not fit for the ordinary purposes for which a vehicle is used, which is for transport on the public highways.

198.    On the date of sale, the Vehicle was therefore not fit for the ordinary purposes for which a vehicle is used, in violation of the warranty of merchantability.

199.    Due to its breach of the warranty of merchantability, the Dealership was unable to deliver the Vehicle to plaintiff's possession until January 30, 2025, more than a month after the Dealership sold the Vehicle to plaintiff.

200.    The Dealership's breach of the warranty of merchantability was fraudulent in nature, egregious, in bad faith, wanton or malicious, or was reckless or grossly negligent and part of a pattern directed at the public generally and plaintiff is entitled to an award of punitive damages in addition to compensatory damages.

**Damages For Breaches Of Warranties**

201.    The Dealership's aforesaid breach of the warranty of title constitutes a breach of the MMWA.

202.    The Dealership's aforesaid breach of the warranty of merchantability constitutes a breach of the MMWA.

203.    The Dealership has committed breaches of the warranty of title and of the warranty of merchantability towards other car buyers, not plaintiff alone, in that the Dealership has on other occasions sold to other consumers cars which it did not own at the date of sale.

204.    The Dealership's breaches of the warranty of title and the warranty of merchantability was tortious in nature, in bad faith, was wanton and malicious, outrageous, or was undertaken with reckless indifference to the interests of plaintiff and other car buyers and the harm they may sustain, entitling plaintiff to punitive damages.

205.    The Dealership is liable to plaintiff for actual pecuniary damages totaling at least $51,153.27: $48,584 (representing the total sale price of the Vehicle, comprising the sale price, sales tax, fees and interest charges) + $1,801 (auto insurance) + $768.07 (auto loan).

206.    In addition, the Dealership is liable to plaintiff for incidental and consequential damages including, but not limited to, lost earnings of more than $8,000.

207.    In addition, the Dealership is liable to plaintiff for actual non-pecuniary, compensatory damages of no less than $56,000.

208.    In addition, the Dealership is liable to plaintiff for punitive damages of no less than three times compensatory damages.

209.    The Dealership is moreover liable to plaintiff for reasonable attorneys' fees, costs and disbursements in accordance with the MMWA § 2310(d).

210.    Ally is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9), as assignee of the loan from the Dealership.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

(Common-Law Fraud)

211.    Plaintiff re-alleges paragraphs 1-210 as if fully re-stated herein.

212.    Through the warranty of title, NYUCC § 2-312, the Dealership represented to plaintiff at the time it sold the Vehicle to plaintiff on December 24, 2024 that it possessed good and clear title to the Vehicle and that it had possession of the certificate of title to the Vehicle.

213.    Through the warranty of merchantability, NYUCC § 2-314, the Dealership represented to plaintiff at the time it sold the Vehicle to plaintiff on December 24, 2024 that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purpose for which a vehicle was used.

214.    As alleged above, the Dealership's representation that it possessed good and clear title to the Vehicle and that it had possession of the certificate of title to the Vehicle was false.

215.    As alleged above, the Dealership's representation that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purpose for which a vehicle was used was false.

216.    The Dealership's representation that it possessed good and clear title to the Vehicle was false because the Dealership did not possess good and clear title to the Vehicle at the time it sold the Vehicle to plaintiff on December 24, 2024.

217.    The Dealership's representation that it had possession of the certificate of title to the Vehicle was false because the Dealership did not have possession of the certificate of title to the Vehicle at the time it sold the Vehicle to plaintiff.

218.    The Dealership's representation that the Vehicle was merchantable in that it would pass without objection in the trade and was fit for the ordinary purpose for which a vehicle was used was false because at the time of the Dealership's sale of the Vehicle to plaintiff, the Dealership did not possess the certificate of title to the Vehicle, rendering the Vehicle objectionable in the trade.

219.   The Dealership knew that aforesaid representations were false at the time it made said representations to plaintiff.

220.   At the time the Dealership made the said representations to plaintiff, plaintiff did not know that the representations were false.

221.   Plaintiff would not have purchased the Vehicle had he known that the Dealership's said representations were false.

222.   The Dealership made the representations for the purpose of inducing plaintiff to rely on them and proceed with the purchase of the Vehicle.

223.   The Dealership knew that plaintiff would not have purchased the Vehicle had plaintiff known, at the time of sale, that the Dealership did not have good and clear title to the Vehicle, did not have possession of the certificate of title to the Vehicle, and that the Vehicle would not pass without objection in the trade and was not fit for the ordinary purpose for which a vehicle was used.

224.   Plaintiff did reasonably, justifiably and rightfully rely on the Dealership's said representations when he purchased the Vehicle.

225.   Plaintiff was gravely damaged by the Dealership's said false representations, as aforementioned.

226.   The Dealership is liable to plaintiff for punitive, actual, and compensatory damages, including incidental and consequential damages, in an amount to be determined at the time of trial.

227.   Ally is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9), as assignee of the loan from the Dealership.

**Punitive Damages For Fraud**

228.   The Dealership's aforesaid fraudulent conduct evinces bad faith, was wanton and malicious, outrageous and unconscionable, and was undertaken with intent to harm plaintiff or was so grossly negligent or reckless as to evince utter disregard for the legal rights of plaintiff, entitling plaintiff to punitive damages against the Dealership. At all relevant times, the Dealership's misconduct was not aimed and practiced against plaintiff only, but was aimed and practiced against other members of the public seeking to purchase an automobile from the Dealership. Plaintiff is entitled to punitive damages of at least three times compensatory damages.

WHEREFORE, plaintiff respectfully prays that judgment be entered against defendants as follows:

(a)   awarding actual, compensatory, punitive, incidental and consequential damages, and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310(d), NYUCC § 2-312 and NYUCC § 2-314;

(b)   awarding actual, compensatory, punitive, incidental and consequential damages for common-law fraud in an amount to be determined at the time of trial;

(c)   awarding pre-judgment interest; and

(d)     for such other and further relief as may be just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
       October 14, 2025.


                                   */s/  Novlette R. Kidd*
                                   NOVLETTE R. KIDD, ESQ. (NK 9339)
                                   KIDD LAW GROUP PLLC
                                   Attorneys for Plaintiff
                                   450 Seventh Avenue, Suite 704
                                   New York, New York 10123
                                   Tel.: 917.340.1635
                                   Nkidd@kiddlawgroup.com